IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RICHARD WEGMANN, II, | ) | CASE NO. 3:09CV1935 |
| | ) | |
| Petitioner, | ) | |
| | ) | JUDGE BOYKO |
| v. | ) | |
| | ) | MAGISTRATE JUDGE VECCHIARELLI |
| WANZA JACKSON, Warden, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Respondent. | ) | |

This matter is before the magistrate judge pursuant to Local Rule 72.2(b)(2).

Before the court is the petition of Richard Wegmann, II ("Wegmann") for a writ of

habeas corpus filed pursuant to 28 U.S.C. § 2254 on July 17, 2008.  Wegmann is in the

custody of the Ohio Department of Rehabilitation and Correction pursuant to journal

entry of sentence in the case of *State of Ohio vs. Wegmann*, Case No. CR 2006 0059

(Allen County 2006).  For the reasons set forth below, Wegmann's petition should be

dismissed.

I.

The February 2006 term of the Allen County Grand Jury indicted Wegmann on

one count of purposeful murder with a firearm specification in violation of Ohio Rev.

Code § 2903.02(A) in the shooting death of Linsi Light.  Wegmann pleaded not guilty to

the indictment.  The state appellate court reviewing Wegmann's conviction found the

following facts to be relevant to his case:

> Wegmann and Light attended college at the OSU-Lima branch in Lima, Ohio[.] Wegmann and Light lived on separate floors of the apartment building located at 1212 Bellefontaine Avenue in Lima[.  D]uring the evening of February 12, 2006, Wegmann shot Light in her left cheek in her apartment with her 9mm semi-automatic pistol[.]  Wegmann voluntarily went to the police afterward[,] and . . . Light died as a result of the gunshot.  The sole issue at trial was whether Wegmann purposefully or accidentally shot Light.

> Wegmann and [Linsi] Light met and began dating sometime during late summer or early fall 2005 and had fairly free access to each other's apartments.  At some point, Light began working at Legend's, a sports bar in Ottawa, and sometimes would not come home on the weekends after work.  Consequently, Wegmann often called Light to see if she was coming home.  In January 2006, Light's ex-boyfriend, Corey Carder, began taking classes at the OSU-Lima branch and spending more time with Light.

> {¶ 9} On or around February 3, 2006, Light broke up with Wegmann, shut him out of her apartment, and stopped speaking to him.  According to Wegmann, Light wanted to separate because she wanted to have fun and go out with other people, but the main reason was that she wanted to experiment with girls and was confused.  That same evening, while drinking in his apartment, Wegmann shot a hole through his mattress with his handgun.  Wegmann stated that he was playing with the gun by chambering bullets through it and pulled the trigger because he mistakenly thought the gun was empty.  This incident, along with the breakup, upset Wegmann so he went back to his parents' residence near Dayton for a brief time.  Wegmann also stated that he was so upset that Light had shut him out that he took a week off of work, slept on the floor of his apartment because sleeping in his bed reminded him of her, and broke her cell phone, which she had left in his apartment.  Anne Marie Leanza and Corrin Moser, friends of Wegmann's and Light's, both testified that Wegmann said he broke Light's cell phone because Carder kept calling her.

> {¶ 10} Approximately three or four days after shutting Wegmann out, Light resumed talking to him and accompanied him to a party at the residence of his coworker, James Weise, on or around February 7, 2006.  Weise testified that Wegmann and Light got along well, acted like a newlywed couple, stayed overnight, and slept in the same bed.  However, Wegmann admitted that, although they slept in the same bed, nothing sexual happened because Light said she still needed time apart.

> {¶ 11} On February 11, the night before the shooting, Light worked a shift at Legend's.  Wegmann and Moser went to Legend's that evening to eat and left without incident after about two hours.  Moser testified that Wegmann wanted to

2

go to Legend's to check up on Light because he believed Carder might be there and that, if they saw Carder's vehicle there, Wegmann wanted to either flatten the tires or slash them.  After leaving Legend's, Wegmann and Moser returned to the apartment building,FN1 but Moser testified that Wegmann said he would probably go check on Light again to see where she went after work.

FN1. Moser also lived in the same apartment building as Light and Wegmann.

{¶ 12} After work, Light went with Carder and his friend to a bar in Kalida.  Around midnight, Wegmann called Light to see if she was coming home and left her a message.  Around 2:24 a.m., Light returned Wegmann's call.  A few minutes later, at approximately 2:29 a.m., someone got onto Light's laptop computer in her apartment, looked at a picture of Light with two other girls named "untitled.bmp", logged onto Wegmann's OSU e-mail account, and attached the picture to an email.  At 2:42 a.m., someone logged onto a Yahoo account on Wegmann's desktop computer in his apartment, looked at an email, downloaded a picture identical to that sent from Light's laptop, saved it to his hard drive, and renamed it "LinsiBitch.bmp."  Around 4:00 a.m., someone conducted multiple internet searches for "Corey Carder" on Wegmann's computer.  According to Kevin DeLong, the Lima Police Department investigator who conducted forensic examinations on Light's and Wegmann's computers and cell phones, the photo sent from Light's computer was the exact same one as that downloaded and renamed on Wegmann's because files have their own unique digital fingerprint and the odds of two files having the same digital fingerprint are nearly impossible.

{¶ 13} Around 2:30 or 3:00 p.m. on February 12, Light took Moser to run some errands and then they returned to her apartment to eat.  Moser testified that Wegmann walked into Light's apartment unannounced, spoke to Moser, and then left.  When Moser left about a half an hour later, Wegmann came and asked him to go down the street with him to get some cigarettes.  Moser testified that they went around 5:30 p.m.; that Wegmann seemed upset because Light was not talking to him; and, that Wegmann said he was going to his apartment to watch a movie after they returned.

{¶ 14} At approximately 7:50 p.m., the Lima Police Department received a phone call from Wegmann about the shooting.  Around the same time, the Allen County Deputy Sheriff, Brock Douglass, happened upon Wegmann in the Market Street square.  Deputy Douglass testified that Wegmann was leaning against his vehicle talking on his cell phone, appeared to be upset and crying, said that he was talking to 9-1-1 and looking for the police station, told him that a gun had accidentally gone off while he was removing the magazine from it, handed him a loaded 9mm magazine and some loose 9mm rounds, and said the gun was in his vehicle.  Deputy Douglass also testified that Wegmann cooperated with him, obeyed his instructions, and consistently stated that the shooting was an

3

accident.  Wegmann was taken to the police station, where he voluntarily submitted to questioning about the shooting by Detectives Timothy Clark and John Bishop of the Lima Police Department.

{¶ 15} When the police arrived at Light's apartment, they found that the door was locked; that the lights were off; that Light's body was on the floor near the entryway; that a white trash bag was underneath Light's head, a roll of paper towels was beside her, and a bottle of Windex was on top of a blanket next to her; that the couch, the floor underneath it, and the pillow on it were saturated with blood and the pillow had an indentation in it; and, that a spent 9mm bullet casing was between the seat cushions on the couch.  The police subsequently retrieved a white trash bag with blood on it, a stack of trash bags, and a 9mm gun in a nylon holster from the front passenger side of Wegmann's vehicle.  The gun had blood, later identified as Light's, on the right side of the slide of the gun and also had tissue matter on the front portion and inside the barrel.  I.D. Officer David Hammond with the Lima Police Department testified that he processed the crime scene and concluded that Light had definitely been shot on the couch and then moved to the floor.

{¶ 16} The video recording of Wegmann's interview was played for the jury. FN2 During the interview, Wegmann stated that it did not bother him that Light stopped coming home on the weekends after work, hung out with Carder and other guys, and wanted to experiment with girls; that he never really considered him and Light to be broken up because they still spent time together; that, during the early morning of February 12, Light called him back to tell him she was not coming home because she was hanging out with friends; and, that he did not know Light was with Carder that evening.  Later in the interview, Wegmann admitted that, during the same phone call, Light also told him that she still needed time and a break from him, but he said it was nothing new to him and did not upset him.

FN2. Prior to the video playback, Wegmann renewed his motion in limine regarding particular statements, which the trial court overruled.

{¶ 17} Wegmann further stated that unbeknownst to Light, he had taken her gun from her apartment before she broke up with him and shut him out; that Light was either not home or was asleep when he took her gun to look at it and play with it because he is fascinated with guns; that he went down to Light's apartment sometime in the evening on February 12 to return some of her clothes and items, including her loaded gun, which were in his apartment; that he placed the gun on the coffee table across from the couch; that Light was lying on the couch and he sat at the other end by her feet and they talked and watched television; that he then got onto his knees on the floor in front of Light to discuss their relationship and convince her that they could work through things; that he subsequently moved to the coffee table and sat across from Light's head; that he

started playing with the gun on his lap when it went off; that maybe the trigger got pulled when he was playing with the gun; and, that he did not point the gun at Light, say anything about shooting her, or intend to shoot her, because he loved her.  Wegmann also stated that the gun barrel was close to Light's face when it was fired.  When Detective Clark asked whether the gun barrel was inches, feet, or yards away, Wegmann replied that he was not sure but that it was more than inches away.  Wegmann demonstrated the distance with his hands, to which Detective Clark replied "a couple of feet?" and Wegmann stated "yeah." (State Ex. 3, 21:55:27).

{¶ 18} Wegmann continued that, after the gun went off, he jumped up and called his friend Patrick right away because he did not know what to do; that he told Patrick he was just going to go to the police and Patrick said that was a good idea; that, before he called Patrick, he tried to pick Light up because he did not know what to do, but he fell against the wall and laid her down; that he did not call 9-1-1 right away because he was scared and did not know what to do; that he did not call for an ambulance because he knew it was too late because Light was not responding; that he did not check Light's pulse; that he did not call the police right away because he wanted to go to them in person and explain himself instead of being taken away in handcuffs; that he locked Light's door so that no one would walk in and see her that way; that he took the gun to give to the police so they would not have to look for anything; and, that he drove down the street looking for the police station, but could not find it so he called 9-1-1.

{¶ 19} Upon further questioning, Wegmann admitted that, after attempting to pick Light up, he went to his apartment to get the cleaning supplies; that he used the paper towels to try to wipe the blood off of her first, but it did not work so he put trash bags over her face because he could not bear to look at her; that he was going to try to clean the floor with the Windex; that he put the trash bag under Light because he did not want to make a mess and did not know what to do; and, that he then called Patrick and went to find the police station.

{¶ 20} When Detective Clark asked Wegmann to sign a consent form so police could search his apartment to corroborate his story about shooting his mattress, Wegmann hesitated, stating that he had a picture of Light on his computer named "LinsiBitch."  Wegmann explained that he had saved the picture and renamed it when he was angry, but had renamed it "a while ago" when Light had shut him out.  (State's Ex. 3, 23:01:30).  Later in the statement, Wegmann explained that he probably had three copies of the picture because Light emailed it to him a long time ago and he emailed it to himself again later, but had never saved it; that he renamed it the day before; and, that he renamed it because he was adding it to his pictures of ex-girlfriends and it was the first name that came to mind.

{¶ 21} During the trial, it was further established that the gun was in proper

5

working condition; that the gun could only be fired if the trigger was pulled; that between four to six and one-half pounds of pressure were required to pull the trigger; that the safety is easy to disengage; that pulling back the slide of the gun chambers a bullet; that it is possible to move the slide back and forth to pop bullets out of the gun without firing it, but the safety must be disengaged; that, when fired, the gun expels the bullet, flame, burned gunpowder soot, unburned and partially unburned gunpowder soot, and gas vapors; and, that one or more of those things may be visible on the skin depending on the range of fire.

{¶ 22} Both parties presented expert testimony to support their version of events. Dr. Cynthia Beisser, the Deputy Coroner of Lucas County, Ohio, and the State's expert in forensic pathology, testified that she performed the autopsy of Light's body on February 13, 2006, and concluded in her report that the bullet wound on Light's cheek was a hard contact wound.  Dr. Beisser explained that she had performed over five-thousand autopsies and was familiar with the trauma gunshots can cause to the body depending on the range of fire; that, if the gun muzzle is held in tight or hard contact with the skin, then burning or charring from the flame of the gun will be visible around the area where the bullet enters the skin; that charring only occurs with a hard contact wound; and, that a hard contact wound also creates a "muzzle imprint" because gases from the gun go under the skin and cause the skin to punch out; that, if the barrel of the gun is in hard contact with the skin, when the skin punches out against the barrel it leaves an imprint of the barrel and creates "a rather large ugly wound."  (Trial Tr., v. 3, p. 778).

{¶ 23} Dr. Beisser continued that, when she examined Light's wound, charring was visible on the skin around the bullet hole; that it was a large ugly wound; that an imprint of the gun slide and gun frame or undercarriage was also visible; that the imprint was a "classic muzzle imprint" (trial tr., v. 3, p. 779); and, that there was no possibility that the wound was inflicted from two feet away, one foot away, an inch away, or even from a loose contact distance.  The State introduced pictures of Light's wound demonstrating the charring and muzzle imprint.

{¶ 24} Dr. Beisser further testified about how the wound would appear if it was not a hard contact wound, explaining that, if a gun is held in loose contact with the skin, which means there is a little bit of airspace between the muzzle and the skin, a ring of soot will be deposited on the skin around the wound; that, at an intermediate range, the soot will dissipate in the air before reaching the skin but the unburned or partially unburned gunpowder grains will be deposited on the skin around the bullet wound and create "stippling" or tattooing from the burning of the skin; and, that, at an indeterminate range, the flame, soot, and gunpowder will dissipate in the air before reaching the skin so that only the bullet hole is visible.

6

{¶ 25} Conversely, David Brundage, Wegmann's ballistics expert, concluded that Light's wound was not a hard contact wound.  Brundage explained that, with a hard contact shot, soot and gunpowder material will be deposited in the wound track; that, if the soot and gunpowder is not visible in the wound track, it can be seen microscopically; and, that, when the gun is fired from very close range, the gas and pressure will cause the skin to billow and slap against the front of the muzzle and leave an imprint.

{¶ 26} Brundage continued that, after reviewing Wegmann's statement to the police, Dr. Beisser's report finding no soot or gunpowder, and the photos of Light's wound, the crime scene, and the gun, he concluded that the markings on Light's cheek were more consistent with a near contact wound from a distance of one-half of an inch to an inch; that the farthest distance the gun could have been from Light's cheek was two to three inches given the elasticity of the cheek and the pressure from the gas vapors; that, from that distance, when the skin slaps against the muzzle, the soot and gunpowder embeds itself in the skin, blackens the skin, and will not wash away; and, that, if the wound was a hard contact wound, he would have expected to see more extensive damage to Light's cheek because a bullet fired from a 9mm gun exits at thirty-five thousand pounds of pressure.

{¶ 27} To support Brundage's conclusion, Wegmann introduced a picture of human tissue depicting the amount of gunpowder and residue deposited from a distant gunshot wound and a hard contact wound, a picture of the underside of the tissue reflecting gunpowder particles in the tissue from a hard contact wound, and drawings of wound patterns from various distances.

{¶ 28} On cross-examination, Brundage testified that he has never conducted an autopsy, but has observed them; that, with the amount of debris expelled by a 9mm gun, residue should be found inside the wound; and, that he did not contact Dr. Beisser to see why she did not find any gun residue inside the wound track, but it may have been helpful to speak with her.

*State v. Wegmann*, 2008 WL 434981, at \*1-\*6 (Ohio App. Feb. 19, 2008).

Prior to trial, Wegmann moved unsuccessfully for a change of venue pursuant to Ohio Crim. R. 18.  Wegmann also moved prior to trial to suppress videotaped statements that he made to police the evening of the shooting.  In August, 2006, the trial court overruled the latter motion after conducting a hearing.  Wegmann then moved  to exclude other evidence, including portions of his statement to police in which he

7

discussed the breakup of a previous relationship and said that he had been in trouble

before, had been in a fight at King's Island, and had a prior arrest for public intoxication.

The trial court overruled this motion.

On October 2, 2006, the jury returned a verdict against Wegmann of guilty of one

count of murder with a firearm specification.  On October 5, 2006, the trial court

sentenced Wegmann to fifteen years to life imprisonment for murder and to a

consecutive sentence of three years' imprisonment for the firearm specification, to be

served prior to the sentence for murder.

Wegmann timely appealed his conviction.  Wegmann raised nine assignments of

error in his appeal:

I.      The trial court erred in excluding evidence and testimony of the defense
        expert's testing thereby denying appellant Wegmann his rights to due
        process of law and to a fair trial as guaranteed by the Fourteenth
        Amendment to the United States Constitution and Article I, Section 16 of
        the Ohio Constitution.

II.     The trial court erred in permitting prejudicial hearsay testimony, thereby
        denying appellant Wegmann his rights to due process of law and to a fair
        trial as guaranteed by the Fourteenth Amendment to the United States
        Constitution and Article I, Section 16 of the Ohio Constitution.

III.    The trial court erred in excluding relevant circumstantial evidence
        regarding the parties [sic] relationship and corroborative of the defendant's
        statement to police thereby denying appellant Wegmann his rights to due
        process of law and to a fair trial as guaranteed by the Fourteenth
        Amendment to the United States Constitution and Article I, Section 16 of
        the Ohio Constitution.

IV.     The trial court erred in improperly and prejudicially instructing the jury on
        accident and foreseeability, thereby denying appellant Wegmann his rights
        to due process of law and to a fair trial as guaranteed by the Fourteenth
        Amendment to the United States Constitution and Article I, Section 16 of
        the Ohio Constitution.

V.      The misconduct of the prosecutor denied appellant Wegmann his rights to

8

due process of law and to a fair trial as guaranteed by the Fourteenth
Amendment to the United States Constitution and Article I, Section 16 of
the Ohio Constitution.

VI.    The trial court erred in denying the motion and supplemental motion to
change venue thereby denying appellant Wegmann his rights as
guaranteed by the sixth and Fourteenth Amendment to the United States
Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.

VII.   The trial court erred in overruling defendant's first motion in limine and
permitting irrelevant and prejudicial evidence from defendant's statement
to police, thereby denying appellant Wegmann his rights to due process of
law and to a fair trial as guaranteed by the Fourteenth Amendment to the
United States Constitution and Article I, Section 16 of the Ohio
Constitution.

VIII.  The trial court erred by overruling appellant Wegmann's criminal rule 29
motions for acquittal, thereby denying Mr. Wegmann his rights as
guaranteed to him by the fifth and Fourteenth Amendment to the United
States Constitution and Article I of the Ohio Constitution.

IX.    The cumulative effect of numerous errors occurring during the
proceedings resulted in a fundamentally unfair trial.

On February 19, 2008, the state appellate court overruled Wegmann's assignments of

error and affirmed the judgment of the trial court.

Wegmann timely appealed the appellate court's decision to the Ohio Supreme

Court.  In his memorandum in support of jurisdiction, Wegmann asserted three

propositions of law:

Proposition of Law No. I:  A Defendant's constitutional rights to due process and
fair trial are violated when a trial court instructs the jury on a defendant's accident
defense in a criminal murder trial using a civil negligence forseeability [sic]
instruction thereby directing the jury to disregard the accident defense if the
defendant was civilly negligent.

Proposition of Law No. II:  When a substantial similarity exists for a ballistic
expert's out of court experiment, and the results of the experiment are relevant
and supportive of criminal defendant's accident claim, the exclusion of such
evidence is prejudicial error which denies a criminal defendant's constitutional
rights to due process and a fair trial.

9

> Proposition of Law No. III:  Appellate review is not a meaningful part of the criminal justice process when the prejudice created by cumulative trial court error is disregarded thereby depriving a defendant [of] his constitutional right to due process and a fair trial.

On August 6, 2008, the Ohio Supreme Court declined jurisdiction and dismissed the appeal as not involving any substantial constitutional question,

On August 6, 2009, Wegmann filed in this court a petition for a federal writ of habeas corpus.  Wegmann asserts five grounds for relief in his petition:

> Ground One:  Petitioner's convictions and sentences are constitutionally infirm because the trial court precluded the admission of evidence regarding the defense expert's testing.

> Ground Two:  Petitioner's convictions and sentences are constitutionally infirm because the trial court utilized a civil negligence foreseeability instruction in petitioner's criminal murder trial.

> Ground Three:  Petitioner's convictions and sentences are constitutionally infirm because the trial court improperly admitted other act testimony.

> Ground Four:  Petitioner's convictions and sentences are constitutionally infirm because the trial court improperly admitted hearsay statements.

> Ground Five:  Petitioner's convictions and sentences are constitutionally infirm because of the cumulative effect of the errors.

Respondent filed an Answer/Return of Writ on November 12, 2009 and amended it on November 16, 2009.  Doc. No. 10. Wegmann filed a Traverse on February 15, 2010.

Thus, the petition is ready for decision.

II

*A.  Jurisdiction*

The Court of Common Pleas of Allen County, Ohio sentenced Wegmann. Wegmann filed his writ of habeas corpus in the Northern District of Ohio and raises claims regarding the constitutionality of his incarceration under 28 U.S.C. § 2254.

10

> Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions. . . . Where an application for a writ of habeas corpus is made by a person in custody under the judgment and sentence of a State court of a State which contains two or more Federal judicial districts, the application may be filed in the district court for the district wherein such person is in custody or in the district court for the district within which the State court was held which convicted and sentenced him and each of such district courts shall have concurrent jurisdiction to entertain the application.

28 U.S.C. § 2241(a ) & (d).  Allen County is within this court's geographic jurisdiction.

This court has jurisdiction over Wegmann' petition.

B.    *Evidentiary hearing*

The habeas corpus statute authorizes an evidentiary hearing in limited circumstances when the factual basis of a claim has not been adequately developed in state court proceedings.  28 U.S.C. § 2254(e)(2).  There is no need for an evidentiary hearing in the instant case.  All of Wegmann's claims involve legal issues which can be independently resolved without additional factual inquiry.

C.    *Exhaustion of state remedies*

A state prisoner must exhaust all available state remedies or have no remaining state remedies available prior to seeking review of a conviction via federal habeas corpus.  28 U.S.C. § 2254(b) and (c); *Castillo v. Peoples*, 489 U.S. 346, 349 (1989); *Riggins v. Macklin*, 936 F.2d 790, 793 (6th Cir. 1991).  If any state procedures for relief remain available, the petitioner has not exhausted state remedies.  *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).

A petitioner must fairly present any claims to the state courts in a constitutional context properly to exhaust state remedies.  *Anderson v. Harless*, 489 U.S. 4 (1982); *Picard v. Connor*, 404 U.S. 270 (1971); *Shoultes v. Laidlaw*, 886 F.2d 114, 117 (6th Cir.

1989).  "[O]nce the federal claim has been fairly presented to the state courts, the exhaustion requirement is satisfied." *Picard, 404 U.S. at 275*; *see also Harris v. Reeves, 794 F.2d 1168. 1174 (6th Cir. 1986).*  The exhaustion requirement is properly satisfied when the highest court in the state in which petitioner was convicted has been given a full and fair opportunity to rule on all the petitioner's claims.  *Manning v. Alexander, 912 F.2d 878, 881-83 (6th Cir. 1990).*

The requirement that petitioners exhaust state remedies is a matter of comity between the federal government and the states:

> The exhaustion doctrine is principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings. . . . Because "it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation," federal courts apply the doctrine of comity, which "teaches that one court should defer action on causes properly within its jurisdiction until the courts of another sovereignty with concurrent powers, and already cognizant of the litigation, have had an opportunity to pass upon the matter."

*Rose v. Lundy, 455 U.S. 509, 518 (1982)* (quoting *Darr v. Burford*, 339 U.S. 200, 204 (1950)) (other citations omitted).  Because exhaustion is a matter of comity, a petition containing unexhausted claims may be denied on the merits.  *28 U.S.C. § 2254(b)(2).*

Wegmann has no state remedies available for his claims.  Because no state remedies remain available to him, Wegmann has exhausted state remedies.

*D.      Procedural default*

Reasons of federalism and comity generally bar federal habeas corpus review of "contentions of federal law . . .  not resolved on the merits in the state proceeding due to respondent's failure to raise them there as required by state procedure." *Wainwright v. Sykes, 433 U.S. 72, 87 (1977)).*  When a petitioner

12

has defaulted his federal claims in state court pursuant to an independent and
adequate state procedural rule, federal habeas review of the claims is barred
unless the prisoner can demonstrate cause for the default and actual prejudice
as a result of the alleged violation of federal law, or demonstrate that failure to
consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  Procedural default occurs when a

petitioner fails to present fairly to the highest state court his claims in a federal

constitutional context.  *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999); *Anderson v.*

*Harless,* 459 U.S. 4 (1982).  Moreover, a failure to present a claim to the highest court

in the state deprives a federal court hearing a habeas petition of jurisdiction on that

issue.  *See McKeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).

If the state argues that a petitioner has procedurally defaulted his claims, the

court must conduct a four-step analysis to determine whether the petitioner has indeed

defaulted and, if so, whether the procedural default may be excused:

First, the court must determine that there is a state procedural rule that is
applicable to the petitioner's claim and that the petitioner failed to comply with the
rule. . . . Second, the court must decide whether the state courts actually
enforced the state procedural sanction.  . . . Third, the court must decide whether
the state procedural forfeiture is an  "adequate and independent" state ground on
which the state can rely to foreclose review of a federal constitutional claim. . . .
This question generally will involve an examination of the legitimate state
interests behind the procedural rule in light of the federal interest in considering
federal claims. . . . [Fourth, if] the court determines that a state procedural rule
was not complied with and that the rule was an adequate and independent state
ground, then the petitioner must demonstrate . . . that there was "cause" for him
to not follow the procedural rule and that he was actually prejudiced by the
alleged constitutional error.

*Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).  A default will also be excused if

petitioner demonstrates that not excusing the default "will result in a fundamental

miscarriage of justice."  *Coleman*, 501 U.S. at 750.

Respondent claims that Wegmann has defaulted all his grounds for relief.  The

13

court will examine this claim with respect to each ground for relief in turn.

> 1.    Ground one:   Petitioner's convictions and sentences are constitutionally
> infirm because the trial court precluded the admission of evidence
> regarding the defense expert's testing

Respondent claims that Wegmann defaulted this ground for relief because Wegmann failed to present this ground for relief to the Ohio Supreme Court in a federal constitutional context.  Wegmann, who is represented by counsel in these habeas proceedings, contends that he did, in fact, properly present this claim in a federal constitutional context.

Fair presentment of a claim in a federal constitutional context requires a petitioner to apprise the state courts that a claim is a federal claim, "not merely as an issue arising under state law." *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984).  A petitioner need not cite "'book and verse on the federal constitution,'" *Picard*, 404 U.S. at 278, to apprise state courts that his claim is based on federal law.  A petitioner fairly presents a federal claim to state courts by relying on relevant federal cases employing the constitutional analysis upon which petitioner relies, by relying on state cases employing a federal constitutional analysis in fact situations similar to his own, or by asserting the claim in terms so particular as raise the specific right protected by the Constitution.  *Franklin v. Rose*, 811 F.2d 322, 326 (6th Cir. 1987) (quoting *Daye v. Attorney Gen.*, 696 F.2d 186, 193-94 (2d Cir. 1982)).  The petitioner must, however, present the claim under the same legal theory and with the same factual predicate as was presented to the state courts. *Wagner v. Smith*, 581 F.3d 410, 417-18 (6th Cir. 2009).

A petitioner does not fairly present a federal claim to a state court merely by

14

presenting the facts underlying his claim for relief, *Picard,* 404 U.S. at 277, nor by making a general reference to a broad constitutional guarantee, such as "due process," *Gray v. J.D. Nederland,* 518 U.S. 152, 163 (1996).  The petitioner must present argument or citations to cases which identify the substance of the particular analysis upon which petitioner relies in asserting his federal constitutional claim.  *Gray,* 518 U.S. at 162-63.  Moreover, "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." *Baldwin v. Reese,* 541 U.S. 27, 32 (2004).

Wegmann's memorandum in support of jurisdiction in the Ohio Supreme Court included the following proposition of law:

> Proposition of Law No. II:  When a substantial similarity exists for a ballistic expert's out of court experiment, and the results of the experiment are relevant and supportive of criminal defendant's accident claim, the exclusion of such evidence is prejudicial error which denies a criminal defendant's constitutional rights to due process and a fair trial.[1]

The argument in support of this proposition of law did not cite any federal caselaw.  It argued that the failure to admit the expert's testimony violated Ohio Evid. R. 702, and it cited only Ohio caselaw in support of the contention that the testimony should have

---

[1]  The corresponding ground for habeas relief contends that the exclusion of the defense expert's testimony violated the compulsory process clause of the Sixth Amendment.  No violation of the right to compulsory process was alleged anywhere in the state court brief.

been admitted.[2] The sole place in which Wegmann mentioned "due process" or a "fair trial" was in the bare statement of his second proposition of law quoted above. The argument in support of that proposition of law does not say anything about rights to due process or a fair trial, does not specify which of the many elements of due process or a fair trial was allegedly violated, does not specify whether the rights referred to were protected by the Ohio Constitution or the federal constitution or both, and does not describe a theory or analytical framework for adjudicating such an alleged violation. As noted above, a mere general reference to a broad constitutional guarantee is insufficient to state a claim for relief, and a ground for relief in a habeas petition must be presented pursuant to the same legal theory presented in the state courts. No legal theory of "due process" or "a fair trial" appears anywhere in Wegmann's state or federal briefs.[3]

---

[2] Specifically, it cited *State v. Nemeth*, 82 Ohio St. 3d 202, 207 (1998), and *Miller v. Bike Athletic Co.*, 80 Ohio St. 3d 607, 614, 687 N.E.2d 735, 741-42 (1998), for the proposition the "[c]ourts should favor the admissibility of expert testimony whenever it is relevant and the criteria of Evid. R. 702 are met." Both cases focused on whether the evidence excluded in each case was properly excluded pursuant to Ohio Evid. Rule 702. *Miller* quoted *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579 (1991), but only for its analysis regarding the admission of evidence pursuant to Fed. Evid. R. 702, the federal counterpart of the Ohio evidentiary rule. Neither Ohio case examined the admission of evidence as protected by rights to due process or a fair trial.

[3] Moreover, neither Wegmann's habeas petition nor his Traverse cites any holding of the United States Supreme Court allegedly violated by the exclusion of the contested evidence. The petition mentions the test for reliability described in *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579 (1991), as the trial court's "purported" reason for excluding the evidence produced by Wegmann's expert. Yet, Wegmann discusses the *Daubert* factors in his Traverse only as they are reflected in *Miller* and to examine whether their use in his case conformed with Ohio Evid. R. 702. Nowhere does he tell the court whether the failure to permit the introduction of the defense expert's evidence violated a Supreme Court holding. Consequently, even if Wegmann had not defaulted this ground for relief, this ground for relief is without merit because he has failed to carry his burden of proving that the state court's decision violated a right protected by the Constitution as found in the holdings of the Supreme Court.

Wegmann did not properly raise in the Ohio Supreme Court any alleged violation of a right protected by the federal constitution related to the state's refusal to allow the defense expert to testify.  For this reason, Wegmann has procedurally defaulted his first ground for relief.

> 2.    *Ground Two:  Petitioner's convictions and sentences are constitutionally infirm because the trial court used a civil negligence instruction regarding foreseeability during Wegmann's criminal trial*

Respondent contends that Wegmann defaulted his second ground for relief because he failed to object to the jury instructions contemporaneously at trial.  Respondent also argues that this claim is not cognizable in habeas proceedings.  Wegmann responds that he did object to the relevant portion of the jury instruction at trial.  Moreover, while conceding that erroneous jury instructions in a state trial are not generally reviewable in habeas proceedings, Wegmann contends that the erroneous instruction in his case was reviewable because it "so infected the entire trial that the resulting conviction violates due process."  Traverse at 17.

Examination of the transcript of Wegmann's jury trial reveals that Wegmann's attorney did object to the foreseeability instruction.  *See* Transcript ("Tr"), Exh. 4, Doc. No. 9, p. 929-31.  In addition, contrary to respondent's assertion, the state appellate court did not state that Wegmann had failed to object contemporaneously to the "foreseeability" instruction and, therefore, did not review the alleged error on "plain error" review.  The appellate court reviewed the claim on the merits as properly before the court.  Consequently, respondent's contention that Wegmann has defaulted this ground for relief is without merit, and the court will examine the merits of this claim.

> 3.    *Ground Three:  Petitioner's convictions and sentences are constitutionally*

> *infirm because the trial court improperly admitted other act testimony*
>
> *Ground Four:  Petitioner's convictions and sentences are constitutionally infirm because the trial court improperly admitted hearsay statements*
>
> *Ground Five:  Petitioner's convictions and sentences are constitutionally infirm because of the cumulative effect of the errors*

Respondent argues that Wegmann has defaulted these grounds for relief because he failed to raise them as independent claims in the Ohio Supreme Court. Wegmann admits that he failed to raise them as individual claims, but he replies that he raised them as part of his third proposition of law.  Wegmann's third proposition of law in the Ohio Supreme Court was "[a]ppellate review is not a meaningful part of the criminal justice process when the prejudice created by cumulative trial court error is disregarded thereby depriving a defendant [of] his constitutional right to due process and a fair trial."

To fairly present a claim to the highest court in the state, an appellant must present that claim as an independent claim, not as an underlying claim to a larger claim. For example, raising a claim of ineffective assistance of counsel in state court based on counsel's failure to assert an underlying claim does not preserve the underlying claim for habeas review because "the two claims are analytically distinct." *White v. Mitchell, 431 F.3d 517, 524, 526 (6th Cir. 2005)*.  Similarly, a claim of cumulative error does not preserve a challenge to individual evidentiary issues, as the claims are analytically distinct.  Moreover, the three grounds for relief that Wegmann asserts in this court have a separate factual basis from the claim that state appellate review was not meaningful. The factual basis for the claims asserted in this court would be the merits of whether the evidence was properly admitted and whether Wegmann was prejudiced by the allegedly improper admissions.  In the Ohio Supreme Court, Wegmann's factual basis for his

18

claim that the state appellate court did not meaningfully review his assignments of error was that the state appellate court improperly analyzed harmless error.  But even if the state appellate court erred in its analysis, such an error would not by itself prove that Wegmann was, indeed, prejudiced by trial errors.  Consequently, Wegmann did not raise the same theoretical or factual bases for his claims in the Ohio Supreme Court that he raises in this court.

In addition, Wegmann did not fairly present grounds three, four, and five to the Ohio Supreme Court as federal claims.  His argument in the Ohio Supreme Court in support of his proposition of law that appellate review of his claims was not meaningful cites two cases:  *State v. DeMarco*, 31 Ohio St. 3d 191 (1987), and *State v. Anderson*, No. 03 MA 252 (Ohio App. 2006).  The brief also noted that the state appellate court found that the admission of the evidence to which Wegmann objected violated Ohio Evid. R. 404.  Wegmann's memorandum in support of jurisdiction to the Ohio Supreme Court did not explain how the state appellate court's decision or the errors of the trial court violated his rights to due process or a fair trial, nor did his memorandum suggest any analytical framework for examining such an alleged violation.

This is not sufficient to raise a federal claim.  As already discussed, a petitioner does not fairly present a federal claim to a state court merely by making a general reference to a broad constitutional guarantee, such as "due process" or "a fair trial."  As Wegmann's memorandum in support of jurisdiction in the Ohio Supreme Court contained only a general reference to due process and a fair trial rather than any argument or analysis addressing such a claim, these general references were insufficient fairly to present a federal claim.

19

A petitioner may, however, fairly present a federal claim to a state court by relying on state cases employing a federal constitutional analysis in fact situations similar to his own.  *Franklin v. Rose*, 811 F.2d at 326.  *Anderson*, cited above, did not rely on a federal constitutional analysis.  On the other hand, although *DeMarco*, also cited above, was decided largely on the basis of Ohio evidentiary rules and Ohio caselaw, the court also found that trial errors, even if individually found to be harmless, could, by their cumulative effect, deprive a defendant of the right to a fair trial. *DeMarco*, however, involved a defendant accused of fraudulently attempting to recover an insurance award for the loss of a car that was not covered by the relevant insurance. The trial court erroneously admitted other acts evidence involving possibly fraudulent behavior with other cars and hearsay testimony from persons involved in the investigation of the crimes allegedly committed by DeMarco.  The fact situation in *DeMarco*, therefore, is not at all similar to the fact situation in the instant case. Consequently, as citation of *DeMarco* in the Ohio Supreme Court was not a citation of a case with a federal constitutional analysis in a factually similar situation, Wegmann did not fairly present a federal constitutional question to the state court.

Finally, the only claim that Wegmann might arguably have preserved in the Ohio Supreme Court was his claim that the trial court's cumulative errors deprived him of the right to a fair trial.  But the United States Supreme Court has never held that cumulative prejudicial error is a ground for habeas relief.  *Millender v. Adams*, 376 F.3d 520, 529 (6th Cir. 2004).  Thus, even if this claim had not been procedurally default, it could not be a ground for habeas relief because the trial court's cumulative errors did not run counter to clearly established federal law as determined by the United States Supreme

20

Court.  28 U.S.C. § 2254(d).

For this reason, Wegmann's third, fourth, and fifth grounds for relief should be dismissed as procedurally defaulted.

III.

The Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA") altered the standard of review that a federal court must apply when deciding whether to grant a writ of habeas corpus.  As amended, 28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under the current deferential standard of review, a writ of habeas corpus may issue only if the state court's decision is contrary to clearly established federal law or was based on an unreasonable determination of the facts in light of the evidence.  *Carey v. Musladin*, 549 U.S. ___, 127 S. Ct. 649, 653 (2006); *Williams v. Taylor*, 529 U.S. 362, 379-90 (2000).  Law is "clearly established" only by holdings of the Supreme Court, not its dicta, and the law must be clearly established at the time of the petitioner's conviction.  *Carey*, 127 S. Ct., at 653.

Courts must give independent meaning to the phrases "contrary to" and "unreasonable application of" in § 2254(d)(1):

> Section 2254(d)(1) defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court.  Under the statute, a federal court may grant a writ of habeas corpus if the relevant state-court decision was either (1) "*contrary to* . . . clearly

21

established Federal law, as determined by the Supreme Court of the United States," or (2) "*involved an unreasonable application of* . . . clearly established Federal law, as determined by the Supreme Court of the United States."

*Williams*, 529 U.S. at 404-05 (emphasis added by the quoting court).  A decision is "contrary to" clearly established federal law if it reaches a conclusion opposite to that reached by Supreme Court holdings on a question of law or if it faces a set of facts materially indistinguishable from relevant Supreme Court precedent and still arrives at an opposite result.  *Id.* at 405-06.  "A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases."  *Id.* at 405.  A decision involves an unreasonable application of federal law only if the deciding court correctly identifies the legal principle at issue and unreasonably applies it to the facts of the case at hand.  *Doan v. Brigano,* 237 F.3d 722, 729-31 (6th Cir. 2001).  The court will examine Wegman's remaining ground for relief using the deferential standard applied to state court rulings on the petitioner's claims.

Wegmann contends that the trial court's erroneous use of a civil jury instruction regarding foreseeability was so grave an error as to constitute a denial of due process. Alleged errors in jury instructions rise to the level of constitutional violations only if "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughton*, 414 U.S. 141, 147 (1977); *see also Engle v. Isaac,* 456 U.S. 107 (1982).

In reviewing the impact of the trial court's jury instruction on foreseeability, this court will analyze the instructions as a whole.  The trial court gave the jury the following relevant instructions as to the elements of murder under Ohio law and regarding the

22

element of "purposely" causing death:

> Before you can find the defendant guilty of murder, you must find that the State of Ohio proved, beyond a reasonable doubt that
>
> (1) on or about February 12, 2006
>
> (2) in Allen County, Ohio
>
> (3) the defendant Richard M. Wegmann, II
>
> (4) purposely
>
> (5) caused the death of another, to-wit:  Linsi Light. . . .
>
> Purposely to cause the death of another is an essential element of the crime of murder.
> A person acts purposely when it is his specific intention to cause a certain result.  It must be established in this case that at the time in question there was a specific intention in the mind of the defendant to cause the death of another.
> Purpose is a decision of the mind to do a certain act with a conscious objective of producing a specific result.  To do an act purposely is to do it intentionally and not accidentally.  Purpose and intent mean the same thing.  The purpose with which a person does an act is known only to himself or herself, unless he or she expresses it to others or indicates it by his or her conduct.
> The purpose with which a person does an act is determined from the manner, which it is done [sic], the means used and all other facts and circumstances in evidence.
> If a wound is inflicted upon a person with a deadly weapon in a manner calculated to destroy life or inflict great bodily harm, the purpose to cause death may infer--may be inferred from the use of the weapon.  That inference, however, is not conclusive, but may be considered in determining intent.
> Proof of motive is not required.  The presence or absence of motive is one of the circumstances bearing upon purpose.
> No one shall be convicted of murder unless he or she is specifically found to have intended to cause the death of another.

Tr., Exh. 5, pp. 1128-29.  Wegmann does not contend that the above instruction

regarding the elements of murder or the meaning of "purposely" is incorrect under Ohio

law.

Wegmann's claim focuses upon the trial court's instruction regarding "causation"

23

that included an erroneous instruction regarding "foreseeability."  The instruction

regarding causation was as follows:

> Cause in this--cause is an essential element of the offense charged.  The state charges that the act of the defendant caused the death of Linsi Light.
> Cause is an act, which directly produces the death of another and without which it would not have occurred.  Cause occurs when the death is the natural and foreseeable result of the act or failure to act.
> A death is the result of an act or failure to act when it is produced directly by the act or failure to act in a natural and continuous sequence and would not have occurred without the act or failure to act.  "Result" occurs when the death is the naturally and foreseeable [sic] caused by the act or failure to act.
> A causal responsibility of the defendant for an unlawful act is not limited to its immediate or most obvious result.  He is responsible for the natural and logical results that follow, in the ordinary course of events, from the unlawful act.
> The test for foreseeability is not whether the defendant should have foreseen the injury in its precise form or as to a specific person.  The test is whether a reasonably prudent person, in light of all circumstances, would have anticipated that death was likely to result to anyone from the performance of the unlawful act.

Tr., Exh. 5, pp. 1129-30.  Upon appeal, the state appellate court acknowledged that the

trial court's instruction for foreseeability, an instruction taken from the Ohio Civil Jury

Instructions, was erroneous.  Wegmann's petition argues that the use of a civil

instruction for foreseeability reduced the *mens rea* of the charge to mere negligence.[4]

At trial, Wegmann admitted that he shot the victim.  The only contended issue

was whether he did so accidentally or purposely.  Thus, the erroneous instruction

regarding causation had no practical effect on the jury's verdict, as that instruction went

to an element of the crime that was not at issue.  Moreover, the court clearly informed

---

[4] Wegmann also contends that the trial court substituted the phrase "unlawful act" for "lawful act."  According to Wegmann, the substitution of "unlawful" for "lawful" misinformed the jury that Wegmann's conduct was unlawful as a matter of law.  Wegmann concedes, however, that he failed to object to this instruction contemporaneously.  Thus, the claim was defaulted pursuant to Ohio's contemporaneous objection rule.  *See Engle v. Isaac,* 456 U.S. 107, 124-29 (1982).

the jury, "No one shall be convicted of murder unless he or she is specifically found to have intended to cause the death of another."  Finally, both the prosecutor and defense counsel referred to the necessity of finding that Wegmann intended to kill Light before he could be found guilty of her murder.

In *State v. Burchfield*, 66 Ohio St. 3d 261, 611 N.E.2d 819 (1993), the Ohio Supreme Court examined a case in which the trial court had erroneously used the Ohio Civil Jury Instruction for foreseeability in giving its instruction for the causation element of murder, as the trial court did in this case.  *Buchfield* was also similar to this case in that immediately prior to the erroneous foreseeability instruction, the trial court gave a correct instruction regarding the element of purpose; the trial court gave a correct instruction that the jury might or might not infer purpose from the use of a deadly weapon; and both the prosecutor and defense attorney correctly described the element of purpose in their closing remarks.   In that case, the Ohio Supreme Court determined that such instructions, while having the potential to confuse the jury, when viewed as a whole "correctly instructed the jury as to the requirement of purpose in a murder charge."  *Burchfiled*, 66 Ohio St. 3d at 262, 611 N.E.2d at 820.  Moreover, the court did not absolutely prohibit the use of the civil foreseeability instruction in murder cases.  Rather, the court expressed concern with the blind application of the instruction "given its potential to mislead jurors," and advised that "[t]he OJI foreseeability instruction should be given most cautiously in future murder cases."  *Id.*, 66 Ohio St. 3d at 262, 611 N.E.2d at 821.

In sum, the Ohio Supreme Court has found that, as a whole, an instruction such as was given in the instant case correctly instructs the jury as to the element of purpose

25

in a murder case.  Keeping that in mind, and also considering that the court, the prosecutor, and defense counsel all reminded the jury that they had to find that Wegmann intended to kill Light before they could find him guilty of murder, it cannot be said that the erroneous use of the civil instruction regarding foreseeability when instructing the jury on the element of causation "so infected the entire trial that the resulting conviction violates due process."  Wegmann's argument to the contrary, therefore, is not well-taken.

Wegmann also argues that the trial court's erroneous use of the same civil foreseeability instruction when it instructed the jury regarding the defense of accident "so infected the entire trial that the resulting conviction violates due process."  The trial court gave the following instruction regarding Wegmann's defense of accident:

> An accidental result is one that occurs unintentionally and without any design or purpose to bring it about.  An accident is a mere physical happening or event, out of the usual order of things and not reasonably foreseen as a natural or probably result of the unlawful act.
> **Foreseeability**
> The test for foreseeability is not whether the defendant should have foreseen the death as it happened to Linsi Light.  The test is whether, under all circumstances, a reasonably cautious, careful, prudent person would have anticipated that death was likely to result to anyone from the act or failure to act.

This accident instruction substitutes gives "not reasonably foreseen" for "not reasonably anticipated" and adds to the accident instruction the civil instruction for foreseeability. The appellate court found that "not reasonably foreseen" is an acceptable alternative to "not reasonably anticipated," but it also found that the use of the civil instruction for foreseeability was error.[5]

_____

[5]  The state appellate court itself erred in finding that the erroneous foreseeability instruction made it easier to meet the criteria for the accident defense.  It did not.  By

26

Wegmann argues in his Traverse argues that the erroneous instruction as to

"foreseeability" defeated Wegmann's defense of accident:

> If the accident defense could simply be discarded by a jury finding that the
> defendant was negligent under civil law, then the instruction improperly removed
> the key defense to the murder trial.  Whether the jury was properly instructed on
> purposeful murder was irrelevant.  The jury was never given the opportunity to
> fairly consider the accident defense--a defense that directly challenged the
> element of purposeful intent.  Instructions on purposeful intent, without an
> appropriate instruction to weigh against it the elements of accident, did not cure
> the error or its associated prejudice.

Traverse at 18.

This argument is not well taken.  Wegmann had no burden to prove that the

shooting was an accident:

> Accident is not an affirmative defense.   Rather, the defense of accident is
> tantamount to a denial that an unlawful act was committed; it is not a justification for
> the defendant's admitted conduct.   Accident is an argument that supports a
> conclusion that the state has failed to prove the intent element of the crime beyond
> a reasonable doubt.

*State v. Atterberry*, 119 Ohio App. 3d 443, 447, 695 N.E.2d 789, 791 (1997) (citations

omitted).  It is extremely relevant, therefore, that the trial court properly instructed the jury

as to the element of purpose in giving the murder instruction.  The state, at all times, had

the burden of establishing a purposeful intent.  Wegmann's assertion that the shooting was

an accident attempt to cast doubt on the element of "purposeful intent."

Furthermore, immediately after instructing the jury regarding murder, the court also

gave an instruction for reckless homicide as a lesser charge to be considered if murder

---

allowing the jury to reject an act as accident if a reasonably cautious, careful, prudent
person would have anticipated that death was likely to result from Wegmann's acts, a jury
would have been, at the very least least, confused as to whether a "cautious, careful,
prudent person" would have anticipated that Light's death was a "likely" result of
Wegmann's behavior.

were not proved:

> The offense of reckless homicide is distinguished from murder by the absence of fail--or failure of purpose to cause the death of another.  Instead, a person recklessly causes the death of another.
>
> \*        \*        \*        \*        \*
>
> A person acts recklessly when, with heedless indifference to the consequences, he perversely ignores a known risk that his conduct is likely to cause a certain result.  A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist.
> **Risk**
> Risk means a significant possibility, rather than a remote possibility, that a certain result may occur.

Tr. at 1131-32.  However much confusion the court's foreseeability instruction caused with regard to Wegmann's defense of accident, the court presented the jury with two choices with respect to the underlying offense:  murder, if the jury believed that Wegmann intended to cause the death of Light, and reckless homicide, if the jury believed that Wegmann acted "with heedless indifference to the consequences" in causing the death of Light.  The jury chose to believe that Wegmann intended to cause the death of Light.  The defense of accident, even if properly instructed, was inconsistent with the jury's determination that Wegmann acted purposely and not recklessly.  Consequently, this court rejects the contention that the trial court's erroneous instruction with respect to foreseeability so infected the entire trial as to violate Wegmann's right to due process.

Because the court's erroneous instruction regarding foreseeability did not so infect the trial as to violate Wegmann's due process rights, the error did not rise to the level of a constitutional violation.  Consequently, Wegmann's second ground for relief should be dismissed as non-cognizable in federal habeas proceedings.

IV.

28

For the reasons given above, Wegmann's first, third, fourth, and fifth grounds for relief should be dismissed as procedurally defaulted.  Wegmann's second ground for relief should be dismissed as non-cognizable in habeas proceedings.  As all of Wegmann's grounds for relief have either been procedurally defaulted or are not cognizable in habeas proceedings, Wegmann's petition for a writ of habeas corpus should be dismissed.


Date:  March 22, 2010                                    /s/ Nancy A. Vecchiarelli
                                                                    United States Magistrate Judge

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111.**